## KNOTT v. ONE HUNDRED BALES OF RAGS.

(District Court, D. New Jersey. March 3, 1894.)

1. SHIPPING—BILL OF LADING—LIGHTERAGE CHARGES.

A bill of lading of certain rags provided for delivery from the ship's deck to consignees, who were to be ready to receive the same "simultaneously with the ship's being ready to unload" them. In default thereof, the master was authorized to "land, warehouse, or place them in lighter, without notice." The consignees, though notified, did not appear, to receive the rags; and, as the health regulations of the port forbade landing them on the dock, the master placed them in lighters, from which they were transferred, after some delay, to a warehouse. *Held*, that the master's action was justified by the bill of lading, and the goods were thenceforth at the risk and care of the consignees.

2. SAME—DUTY OF CONSIGNEES.

When, several days later, the consignees appeared and claimed the rags, they objected to paying the lighterage expenses; and finally the ship's agent sent the rags to a warehouse, where the charges were much

less than on the lighter. The consignees afterwards objected to the lighterage expenses, as excessive; claiming that the goods should have been sent to the warehouse immediately, so as to reduce the expense to a minimum. It appeared, however, that it was necessary to obtain permits from officials for the removal and storage, which required some time. *Held,* that as it was the duty of the consignees to attend to these details, and having chosen to leave them to others, they could not complain of the delay.

This is a libel in rem filed by James Knott against 100 bales of rags under a bill of lading, to recover lighterage and other charges.

Convers & Kirlin, for libelant.

Leavitt, Wood & Keith, and Albert H. Atterbury, for claimant.

GREEN, District Judge.    In March, 1893, the steamship Spanish Prince arrived at the port of New York from Leghorn with a general cargo, consisting, among other things, of 100 bales of rags consigned to I. B. Moore & Co., or to their assigns, under a bill of lading which provided for a delivery in good order to the consignees or their assigns "from the ship's deck, where the ship's responsibility shall cease."    The bill of lading also contained these clauses:

"Simultaneously with the ship being ready to unload the above-mentioned goods, or any part thereof, the consignee of said goods is hereby bound to be ready to receive them from the ship's side, either on the wharf or quay at which the ship may lie for discharge, or into lighters provided with a sufficient number of men to receive and stow the said goods therein; and in default thereof the master or agent of the ship, and the collector of above port, are hereby authorized to enter the said goods at the customhouse, and land, warehouse, or place them in lighter, without notice to, and at the risk and expense of, the said consignee of the goods after they leave the deck of the ship."    "The captain or owner has a lien on the goods for unpaid freights, through freights, average claims, or liabilities incurred in respect of any charges stipulated herein to be borne by the owners of the goods."

The steamship arrived at the port of New York on the 14th of March, and was docked at the South Atlantic dock, Erie basin, Brooklyn.    She commenced discharging her cargo immediately. Notice of the ship's arrival and discharge was given, in the customary manner; and the consignees of the bales of rags (residing, as it appeared, in Boston) were duly notified by telegraph.    All of the ship's cargo, except these rags, was discharged on the 17th of March.    Neither the consignees, nor any one acting for them, claimed or called for the rags; and, as the space in the hold of the ship where they were stowed was needed for the stowage of the outbound cargo, the master discharged them into lighters, which had been especially hired for that purpose, the health regulations of Brooklyn forbidding their discharge upon the dock or quay where the rest of the cargo had been discharged.    The steamship sailed from the port on her return voyage March 19th.    When the consignees claimed the rags, which was not for several days, objection was made by them to the payment of lighterage expenses; and finally the rags were sent by the agent of the steamship to warehouses at Hoboken, N. J.    This libel is filed to recover the expenses which were incurred by the master and agent of the steamship in discharging and removing the rags from the ship first into the lighters, and then to Hoboken.    The claimant's insistment is that the charges were largely in-

curred improperly, and are exorbitant, and ought not to be allowed, except to a very limited amount.

The material facts in the case are practically admitted. The sole question is the proper construction of the clauses of the bill of lading which have been quoted. The acts of the ship's master or agent in discharging the bales of rags as was done must find justification there; for it is a duty incumbent upon carriers by water to deliver to the consignee, and a substituted delivery can only be regarded as a compliance with that duty when made in strict accordance with the terms of the bill of lading, which expresses the contract between the carrier, the shipper, and the consignee. Now, with these clauses of the bill of lading in question, there cannot be any perplexing difficulty. They are plain and explicit. On the one hand, the carrier is to make a proper delivery, after due notice, if possible, to the consignee. On the other, the consignee is to be ready to receive the goods consigned to him, at the place where they are to be discharged. If the consignee, however, is not ready to receive the goods, then the express authority is given the master or agent of the ship to "land, warehouse, or place them in lighter, without notice." In the present instance the health regulations of Brooklyn forbade the unloading of the rags upon the dock where the rest of the cargo had been discharged. The only alternative left the master or agent was to discharge them into the lighter. In so discharging them, the master was acting clearly within the terms of the bill of lading; and such discharge, therefore, constituted a perfectly legitimate delivery. And, from the moment the rags were thus delivered from the ship's deck, the ship's liability ceased, and the consignee's liability began.

But it is urged that the "discharge into lighter" was only a preliminary step to "warehousing," and a means to that end, and the rags should have been immediately forwarded to a "warehouse," so that expenses would have been reduced to a minimum. It appears from the evidence that the lighterage charges were largely in excess of warehouse charges, and that the rags were left upon the lighter for several days before they were forwarded to the warehouse in which they were finally stored. But the contention of claimant's proctor, while it is acute, is hardly accurate. The landing of the goods, the storing of them in warehouses, the discharge into lighters, are alternatives, either of which may be taken by the master or agent of ship in default of the consignee's readiness to receive the goods. The only implied condition which can be annexed to either is that the goods so treated, in any case, shall not, by reason of such treatment, come to harm. Barring that, the master is to be judge of what is best. But in this case, as has been said, but one of the alternative courses was open to the master. Health regulations of the port forbade the choice of any other. The discharge into lighters being, therefore, a good substitute delivery, for such expenses as thereafter accrued the consignee became liable; and if such expenses were paid by the ship, under the terms of the bill of lading, a resulting lien was had in her favor upon the goods.

But if this construction of the bill of lading be too broad,—and

it is readily admitted that exemptive provisions, as these are, should be strictly construed,—the only remaining question would have regard to the diligence of the master in discharging into lighter, and sending the rags to the warehouse, after he had notice that the consignee had failed or had refused to receive them from alongside the ship; for the insistment of the claimants in this regard must necessarily be based upon the admission that the rags were rightly lightered in the first instance, and afterwards properly stored in the warehouse in which the claimants desired them to be placed. The evidence discloses that certain preliminary action had to be taken so as to obtain the permits from the proper officials which were necessary to effect the removal and storage of the rags. That some time was consumed in doing this appears. But it cannot be equitable to charge that expense of time to the libelant. Clearly, it was the duty of the consignees to attend to these details. If they failed to do so, and chose to leave the matter to others, they cannot now complain of the apparent slowness of the ship's agent in accomplishing what they might possibly have done in less time.

Upon the whole case, as presented, I am of the opinion that the libel be sustained. If parties cannot agree upon the amount due, let there be the usual reference.